Our last case for argument today is 24-1664, Galderma Labs v. Lupin. Your Honors, the data submitted with Lupin's ANDA about its commercial product should have controlled the infringement analysis here. Instead the District Court discounted and ignored that data based on an alleged credibility determination. But the data can't be ignored under this Court's case law and numbers don't lie. The intrinsic evidence directs us to the relevant data. We have functional claims here that are based on in vivo blood levels and those limitations are met to a tee. The preferred embodiment in the specification says use pH 4.5 and up to 2 to 4 hours as dividing lines for enteric-coated products in these tests and those are the test results that we relied on. Well, you say you have a functional claim, but I don't think that's exactly right because this claim is to a composition consisting of, right? So while it's absolutely true that this composition consisting of must result in certain blood levels, there are actually quite tangible limitations in this claim about the composition of the pharmaceutical, correct? That's correct, Your Honor. And the District Court has consistently construed those components as based on functional limitations. For instance, it defined immediate release in its claim construction opinion at A3101 as intended to release substantially all of the active ingredient. Yes, I mean, I think we all know what delayed release and immediate release mean. That doesn't mean that this is a functional claim because it still requires 30 milligrams of doxycycline and it requires 10 milligrams of delayed release doxycycline, right? I mean, what am I missing? Those are the requirements of the claim. What's missing is the actual claim construction, which says that release for terms immediate release and delayed release is a functional limitation, I'm quoting from it, referring to a release that alters the subject's steady state blood levels of doxycycline. So we determine what immediate release is and delayed release is all about what it does to the blood levels in the body upon release, and that's part of the claim construction here. So that's what I mean by functional. But then are you saying in your ANDA, when you say you have 22 milligrams of immediate release and 18 milligrams of delayed release, that you weren't using it in its standard understood sense, the same way the district court construed it in this case? You weren't using the words IR and DR in their functional capacity? Well, it was their ANDA, Your Honor. Well, that's whatever. You're saying it wasn't being used in its functional capacity? It was not. It was used in a structural capacity there. It simply referred to parts of the composition. So sometimes, according to you, when 22 milligrams of IR is talking about something structural and other times when 22 milligrams of IR is talking about something functional? I'm just struggling. In the claims of the patent, IR and DR refer to functional release to create blood levels. In their ANDA, they call it a 22-IR-18-DR product. That's not what it is. That's not how it functions. We know that another 8 milligrams is immediate release from what they call the delayed release portion. How do you know what that is? We know that from the data, Your Honor. We know that from A6559 where we see one capsule that directly infringes and releases 75% immediately at pH 4.5, which is a relevant pH under the preferred embodiment. And we see a range right around 75% and we see a mean of all 12 capsules of 71 and 75% at 1 and 2 hours. We also know that this product functions to create the blood levels that are required by the claim. Just like the reference drug, which is a 3010 product, is required by the claims. That didn't happen by coincidence. It happens because they designed a product that releases immediate release and delayed release components functionally to create those blood levels. It functions just as a 3010 product. Just like the reference drug and it's bioequivalent to it. Now here, that data was ignored. That data was ignored because the judge, the district court, decided that pH 4.5 wasn't a relevant pH. That's one reason. Well, he excluded the preferred embodiment in doing that. The preferred embodiment, which is set forth at A66 to 67 and A85 to 86, specifically says the right dividing line for an enteric-coated product is about pH 4.5. I think that your argument boils down to, unless I'm mistaken, a clear error in the infringement finding. You think that their 22 IRR 18 DR meets the claim's 30 IRR 10 DR limitation and basically I think all your arguments boil down to the district court should have accepted the single test in Lupin's ANDA at 4.5 pH, right? That's the primary argument and it should have credited that with the in vivo data that showed by what's in the works. Here's the problem. If the court found that there is a difference or you didn't show a correlation, I should disregard that analysis by the district court? Yes, because that turns the burden of proof on its head in terms of what we're allowed to rely on under this court's case law, like Glaxo. The Glaxo line of cases says you can turn to the data that's part of the ANDA submission, which was certified to be true and correct by them. Only if at the end of the ANDA submission, you can turn to the data that's part of the same thing. I mean, if one is in vitro and one is in vivo, there has to be some... You have the burden of proving infringement. And if they say something in the ANDA which is not exactly the same thing as your claim, you have to prove why it is the same thing as your claim. And we did, Your Honor. Their data proves that. Both the in vitro... No, with the district court settings, you didn't introduce anything to show that it would behave the same way in both the in vitro and in vivo settings. There's no requirement that we show an in vivo, in vitro, in vivo correlation in these claims. That's not in the claim. It doesn't say you have to show that correlation. It says show a 30-10 product that creates a certain... What about the district court's conclusion that this whole 4.5 pH is problematic because the drug is intended to be taken when fasting, and even if you add water, that is still putting you down in the 1-2 pH range, not at 4.5. So, even if you showed... Even if this experiment were accepted to demonstrate that in this one instance, at this one pH, which is not the way the drug is normally used, it might break down and you might have this IRDR functional equivalent that you're talking about, but that that's not the normal use. I mean, that's what the district court found. What do you make of that? I don't understand it at all. It's a complete contradiction to the preferred embodiment of the specification, which was pointed out to the district court at plain construction and throughout the trial. And you can't write out the preferred embodiment and say I'm not accepting test results at pH 4.5 based on some extrinsic evidence. I don't understand. What do you mean about the preferred... How is this the preferred embodiment? The specification at A66 to 67 says, and I'll take you to it, Your Honor. I'm in the patent just on the column and line number. You're welcome. If we go to column 5, we see the first recitation of what the preferred embodiment is. At line, my eyesight is terrible, 50, 58. This is where we start talking about preferred embodiment. Then at line 62, it talks about the first unit being an immediate release dosage form. Then at column 6, line 64, it talks about the second unit being a delayed release form. And if we flip the page to column 7, line 15, I'm sorry, my eyesight is terrible, 15, it talks about the delayed release form using enteric materials such as Oydergit. Oydergit is mentioned at line 33, and that's exactly what the defendants use on their product to coat the so-called delayed release portion. And here's the key. This is still part of the preferred embodiment. Column 7, line 37. With the enteric coated pellets, there is no substantial release of doxycycline in an acidic stomach environment of approximately below pH 4.5. But it says below. That's the dividing line. That's exactly right. Because Oydergit, and this is part of the record, only starts dissolving at pH 5.5. That's the whole point here. So we're going to look at that dividing line. The doxycycline becomes available when the pH-sensitive layer dissolves at the greater pH of the small intestine. That's pH 5.5. After a certain delayed time, or after the unit passes through the stomach, the preferred delay time is in the range of two to six hours. So the district court ignored that and said, well, I'm not going to rely on these test results. They're at pH 4.5. That's too high. There's extrinsic evidence from the other expert that says that's too high for the stomach. Even though, by the way, there was documentary evidence submitted in the Klansky article and other portions of the ANDA which show that 4.5 certainly does exist in the stomach. Okay, so if I'm understanding you correctly, and that's maybe a, the district court says, the district court credited the other test, Dr. Buckman's testimony that the pill was already soaked in acid for two hours, which means that at the time of pH 4.5 was not representative of how the pill would behave in the body. Right. They found that it was not a biologically relevant pH for a fasted stomach. And they also disregarded this article you seem to be relying on for that proposition, Kalansky or whatever. Kalansky, yes. Under the standard of review, how would we reject those findings? Well, you can't accept that conclusion when the preferred body has been read out of the claim to get there. The claim doesn't say a thing about pH. The preferred body says pH 4.5. And he's saying, well, there's some piece of extrinsic evidence out there and some extrinsic testimony by some expert that I credit over the other expert, so I'm not going to pay attention to this data. I mean, that's really a claim construction error in the application of the data to the claim. I don't know. It seems like Patton says below 4.5. It actually suggests that if you start getting to 4.5, you will have breakdown. So it's below 4.5. And then didn't he also talk, I mean, I don't even know what all this stuff really means from a technical standpoint, but that there were also differences. He said something about the RSD value, and he pointed to other differences that informed his decision that this was not the same. He pointed to variability in the data set, in the end of the data set. But variability is not a bar to infringement. One instance of infringement is enough, and he admitted that capsule one infringed if he accepted pH 4.5 as an okay pH. But was this all done under the umbrella of his rejecting the two-stage requirement, which your case relied on? And he gave like four different reasons, including the one I cited and the one the chief referenced, to establish that the two-stage test was not applicable. Not applicable and or unreliable in his view. And he had a number of reasons for that. He had a few reasons. But they're all incorrect and can't trump the intrinsic evidence here. Mr. Flatman, you referred to column seven, and you said the district court was wrong to ignore the preferred embodiment and to ignore the 4.5 pH. But the sentence after the sentence you pointed to says that oxycycline becomes available when the pH-sensitive layer dissolves at the greater pH of the small intestine. Yes. That greater pH is 5.5, correct? That's correct, Your Honor. And isn't that exactly what the district court looked at? Well, we said that 5.5 is more relevant and 4.5 is not the proper focal point for this test. But he got it totally wrong when he made that conclusion. It's not logical. At 5.5, the delayed release is going to release. So that doesn't tell you anything about how much immediate release there is. You have to look at something below 5.5 to see how much immediate release there is. That's what the patent is telling us in that preferred embodiment. But that's why he's concluding that the 8 milligrams that you say are released in the stomach before it gets to the small intestine, but he concluded that that doesn't really happen. He concluded that it doesn't happen, but A6559 tells us it does. Because we know that before it gets to pH 5.5, those extra 8 milligrams have been released. We know that from the data set, and the best example being capsule 1. We know that from that data set because the mean release of the 12 capsules, whether they're variable or not, was 75%. Now, I'm not sure the mean is the right way to look at this, and that was only one capsule. Well, one capsule is enough under this court's law. Under Broadcom, under Research Foundation v. Myelin, a predecessor case to this case. It's enough, but there's more. This is a 230,000 capsule batch, the commercial batch. One out of 12 is hitting the bullseye. So it logically follows it could be 20,000 more that are at or around that bullseye. That's more than enough for infringement, and certainly under this court's case law. Now, the mean does matter. You're over all of your time. I'm sorry, if you have another question, please go ahead. You're over all of your time. I'll restore some time for rebuttal, though. But let's hear from the Housing Council. Thank you. Either way. Good morning. May it please the Court. William Mercosi for Lupin. I'll start with that 4.5 issue. So we heard a lot about how the court supposedly ignored the 2-stage 4.5 data. They say ignored, he disregarded. We had an entire trial just about that 2-stage pH 4.5 data. The court rejected it for a number of factual determinations. Number one, the credibility. He found their expert not credible. He credited our expert, Dr. Buckton. But that doesn't answer any questions at all because the data is in the ANDA. Yes. He credited our expert. Who cares about your expert? The evidence is in the ANDA. So tell me what your expert said in particular that he credited that allowed him to disregard the evidence in the ANDA. I wouldn't say he disregarded it, Your Honor, but I was just going to do that. Reject whatever. Point two, the court found as a factual matter, crediting Dr. Buckton and the literature that Galderma relied on, Colancy and Dressman, that the fasted stomach pH, which is what is relevant here, is 1 to 2 or slightly higher. It is not pH 4.5. That's a problem for their whole infringement theory and appeal because everything relies on pH 4.5 being the pH of the fasted stomach for them. The second fact finding he made that you can't prove immediate release using the second stage of a two-stage test at 150 minutes, 180 minutes, and 240 minutes because you can't infer how that would behave in vivo, both because it's the wrong time points. You don't prove IR using the second stage time point and because it's the wrong pH. Three, he found as a factual matter that the skilled person wouldn't rely on that test because of the evident flaws and anomalies given in the data that, again, they completely ignored. Those flaws and anomalies included things like an incredibly high relative standard deviation for lupin, 18 to 22 percent. The testimony was if it's above 10, that's unacceptable and you need to further investigate. Can I ask, I mean, you're wanting us to cabin in, and certainly the district court did, the notion that this analysis should occur only in pH ranges of 1 to 2 and certainly less than 4.5. Why did your ANDA include this 4.5 pH data then? Why is it there? Because it did demonstrate some delayed release jumping out early. Well, actually, two responses to that, Your Honor. First off, the FDA requires what they call multimedia testing in pH 1.1 and then various pHs after that. It's in one of their guidances. Number two, the data actually did not show release of DR pellets in pH 4.5. And the district court went through this in detail. That test is actually not at pH 4.5. It is not at... Because it's soaked first. So the clock doesn't start over. First, you stress it in acid for two hours. It hydrates. You credit Dr. Buxton's testimony at that point. The clock doesn't start over after two hours at the second stage. That's number one. This is the hot spot theory thing. Not yet. I'm getting to the hot spot theory. And then number two, Your Honor, it's not at pH 4.5. First, it's pH 1.1 two hours. The paddles are stopped. Then it's pH 11. Then, once it gets up to 4.5, the paddles start again. So it's not actually being tested at pH 4.5. But the product was tested at pH 4.5. Lupin tested the rebuttal batch in pH 4.5, and there was no release at all from the DR pellets. And that raises a very interesting scientific question. If your entire case is based on what happens to these little DR pellets in pH 4.5, would the skilled person and a reasonable scientist rely on a test that actually is not testing in pH 4.5? The second stage of a test which is not for measuring IR? That's the test you did in the ANDA, and it was right? No, we took their theory when they raised this. I'm not talking about the rebuttal testing. I'm talking about in the ANDA. Yes. You did this test, and your data showed release. So you're saying this test is not what? Like it's your ANDA. Well, as the district court found, Your Honor, there were evident flaws and anomalies in the data. Number one, standard deviation. And number two, remember, it's a comparative test. It's running the Lupin product versus the Oratia commercial embodiment. And in that same test, the Oratia percent dissolve was going down. Are you talking about the ANDA data? The ANDA test was testing two products. I just want to focus on one narrow thing, which I think coincides with what the Chief was getting at, which is there's a lot of evidence here, and a lot of it goes on your side. But the district court, in one of his conclusions, concluded, as I understood it, that the data submitted in the ANDA was unreliable. And if we have pause about saying that and concluding that, is there an alternative basis? I mean, I think his finding about this two-stage being unreliable was broader than that. It was that it doesn't replicate what goes on in the human body. But is there a way to avoid or to explain, or do we necessarily have to conclude that the data submitted in the ANDA was unreliable? Well, first off, Your Honor, there were flaws in the data, which we then investigated. Flaws in the data you submitted to the FDA? Flaws in the test. It proved there was no release. Did you submit corrections to the FDA? We absolutely did not, Your Honor. So you're telling me you submitted flawed data to the FDA in pursuit of approval of your application, and you're now testifying in court, basically, that you know and your client knows that that data is flawed, but you didn't submit any sort of correction to the FDA to clarify? The testimony was that the data was given to the FDA as is, the FDA reviewed it, and the FDA approved the product as 2218. Yes, but they rely on your testing, and you're now telling them that you know your testing was unreliable. So you know, your client now knows it submitted unreliable data to the FDA, and you're telling me there is no obligation on your client to follow up and correct the record with the FDA? No, I never used the word unreliable, Your Honor. We did not submit unreliable data. We submitted the actual data and outputs from that test. What I'm saying is the district court found, and as Dr. Buckton, Mr. Avachat, and Ms. Gray testified, the data is the data, but there are artifacts from the test protocol itself that raised questions for further investigation, which we did and proved there was no release whatsoever from those DR pellets at 4.5. And to get back, Judge Prose, to your question, there are several fact findings outside of that which are problematic for the appellants here. The first one, even putting the credibility determination aside, the first one is that pH 4.5 is not the relevant pH. That's a fact finding. That's a major problem for them. The second one is you wouldn't try to prove immediate release using 150 minutes, 180 minutes, 240 minutes. That's a problem for them. And then even if we put aside the test protocol itself, we still have the testing that was run in pH 4.5 and showed no release from the DR pellets whatsoever. So there's layer after layer of fact findings here that would have to be reversed in order for them to prevail. Now, as far as the FDA issue goes, there was nothing to correct. The data is the data. The FDA reviewed it. They didn't have a problem with it. I assume there was a lot more data than this one page of test results. Oh, there were dozens of similar multimedia tests in various pHs and various stages, single and double stage tests. It just wasn't this one. This is the one they narrowed in on when they raised their two-stage pH 4.5 theory. There you mean the other side, not the FDA? Correct. The FDA never questioned any of this data. The FDA approved the product as correctly labeled as 22 mg immediate release, 18 mg delayed release. How is it that a drug that has a different in vivo IRDR dissolution ratio, how is it that a drug can be bioequivalent? Bioequivalence is different from in vitro dissolution. So in vitro dissolution, the industry standard test of pH 1.1 followed by the 6 is testing how does that release, the first part release in the stomach in vitro and then how does the second part release in the higher pHs of the intestine. But I'm talking about in vivo. In vivo, you're arguing that your client's drug is different and doesn't infringe because it has a different IRDR dissolution ratio. Different ratio and different dissolution, yes. But yet it is somehow bioequivalent. Just as a matter of science, I'm having trouble understanding that. Because bioequivalence is a different measure with a wide goalpost of 80 to 125% blood level comparison with the reference drug or the brand drug. But here the bioequivalence was, the graphs were pretty similar, were they not? Well, they were within the 80 to 125%, which means they were bioequivalent, Your Honor, which is not enough to prove infringement. But there was also evidence at trial that Dr. Buckton testified to that the blood levels were not identical, actually. If you look at the individual plots at 20 minutes, 40 minutes early on, they actually are not identical. And their expert, Dr. Buckton, there are some substantial differences at certain time points. And their expert was not able to reconcile why that was. Or he was also unable to testify what would a 2218 product look like? Because remember, his position was it's not 2218, it's 3010. He couldn't answer, well, what would the blood levels of a 2218 product look like? He also admitted that you cannot infer composition ratios from blood level data. And so that was a bit of a sideshow on the blood level data. I have a dumb question. What about the claim imports into it the fasting component? Because it just says, you know, Orville Pharmaceuticals achieved this blood level. And it doesn't talk about pH in the claim, nor does it talk about, you know, the criteria under which somebody would therapeutically receive this particular drug.  And I was actually... Excuse me, Judge. I was actually just going to get to that point in this preferred embodiment issue. The claim itself does not say fasted stomach or have a particular pH. But all parties agree that when you are measuring IR and DR, you need to use a fasted stomach. Because if you don't, in a fed stomach with a super high pH, everything would be 110% immediate release. These products have to be taken on an empty or fasted stomach, or they will not work with their IR and DR. And that is actually set forth in the patent in the preferred embodiment. I disagree the preferred embodiment is set forth in those columns. The preferred embodiment is in Examples 1, 2, 3, and then tested in Figures 1, 2, 3. It is a 30-10 composition, 30 IR, 10 DR. That's exactly how it's made compositionally, Judge, to your earlier point. You structurally take 30 milligrams of IR pellets, 10 DR dose... Do you agree with your opponent's arguments about this being functional claim language? I mean, suppose that when you ran all the rebuttal tests, you did find that due to a weakened encapsulation layer, you had the delayed release releasing earlier, right? I mean, if that were the case, would you agree that there's infringement here even though you have 22 and 18 as opposed to 30 and 10? I would say you are correct, Your Honor. The other is compositional and functional elements of these claims. They are both. I agree with that. If it was done at a reasonable, appropriate pH and reasonable time points, and if you could show that the lupin product was actually immediately releasing 30 milligrams and delaying release of 10 milligrams, then that would be a 30-10 composition. I have one more really dumb question. These are just dumb science questions. But it doesn't. I just want to say it does not do that. I'm sorry, Your Honor. But when you're talking about immediate release or delayed release, are those different underlying chemical compositions or are they different only in the layer that is put onto the delayed release to keep it from digesting and therefore releasing as quickly? So meaning, is it the exact same underlying active ingredient? It's just a matter of you protect a little bit of it so it doesn't get digested as quickly? Yes. If you look at examples 1, 2, 3, you make the exact same immediate release pellets or beads, whichever you want to call them, which don't have any coating on them. So they'll release immediately in the stomach and the stomach pH of 1 to 2. And then you take those same beads, you put a portion to the side, and you put an enteric coat on them. Right. So that's the whole argument about the coating and you used a weaker coating, right? Correct. That's their argument, yes. Okay, so your 2218 is predicated on the ones that have no coating and the ones that have coating. Correct. The 22IR do not have the enteric coat and the 18 mg DR do have the enteric coat. And so even though you say that, it could be possible that depending on how you construct the enteric coat, it doesn't actually keep those pellets from releasing for as long. I know that you're saying it's not what's happening here, but obviously in some circumstances it could because under your ANDA, under different circumstances, I understand it did cause an immediate release, at least that one example. Well, there was no evidence, Your Honor, that the coat is weak. That was a theory they had that using a certain solvent was somehow intentionally designed to be weak. The actual testimony at trial and the court's fact findings were that the coating was just fine. It was a perfectly good functional coating. It passed all tests. And again, when it was tested in pH 4.5, the DR pellets and that coating did not leak and did not release at all. The last point, quick two points. I see I'm running out of time. Can I have another dumb science question? Sorry, you're like Bill Nye the science guy at this point for me. So anyway, you said, I'm still troubled by the same thing that Judge Lynn is, and I realize this doesn't resolve your case in its entirety by any stretch, but just this notion that these two products could be bioequivalent despite the fact that they're saying 30-10 and you're saying 22-18, and you said, oh, it's good enough if it's between 80 and 125 percent. Well, if I just take 30 milligrams and figure out what 80 percent of that is, it's not 22, right? It doesn't sound like it's within 80 percent. The blood levels don't correlate to composition, and they're expert admitted. You can't infer compositional ratios from blood levels. But I will tell you, Judge, to go even more directly to your point, it's unremarkable that a non-30-10 could be bioequivalent. There's evidence in this record from Dr. Buckton and another gauldron patent called the 5-1-6 in this record that was a 32-8 and a 34-6 composition. So it's not 30-10. Those were also bioequivalent. So you don't need to have the magic 30-10, I guess, to answer your question, to be bioequivalent. Last quick point. The preferred embodiment actually is 30-10. It's described. And then the patent gives you the industry standard test for proving not just the 30-10, but the release. It gives you that in Figure 3. You put it in the pH 1.1, the industry standard for the fasted stomach. You see how much it releases. It then changes over to pH 6 or 7. They stress it for two hours at pH 1.1 to make sure that none of those little delayed release guys release. Then they change it at two hours to a pH 6 or 7, which is the higher pH in the intestine. So they've now eaten or is it because it moved to the intestine? It's moved to the intestine. Okay, got it. It quickly moves from the stomach where the IR dissolves. Then the DR pellets and that dissolved IR, well less than an hour, Dr. Buckton testified, 20 minutes, moves into the duodenum or the intestine where the much higher pH, 6 or 7, then dissolves the DR pellets. That's how it's supposed to work. The tests and the patents in Figure 1, 2, and 3 actually measure that. That's the industry standard test for measuring IR. Last point on the 4.5 in the specification. No expert ever testified at trial that that portion of the specification somehow delineates IR, DR. The 4.5 is the measurement. That never came up. That argument didn't arise until closing arguments. It solely came from counsel, and that passage doesn't say what they say it says. It says below 4.5, which is unremarkable because as a factual matter, we know that the fasted stomach is well below 4.5. Okay, great. Thank you for your time. You have three and a half minutes, please, because that's how much is on the other side. Thank you, Your Honor. Your Honor, counsel says that the 4.5, 2 to 4 hours is not the preferred embodiment. That's the only thing that's called out in the specification as a preferred embodiment. It's not Figures 1, 2, or 3, as counsel was saying. It's important to understand the importance of this 4.5 data for this product. At pH 1.1, there's no delayed release. The product is locked down. This 1.1 pH does nothing to the oestrogen coating. It could sit there for days, and there was testimony to that effect at A4882, and nothing would happen. So this is a red herring in terms of the effect of this pH 1.1 in the two-phase test. At pH 4.5, there should still be nothing coming out of the oestrogen-coated pellets, and yet here, the data tells us that there is. That's not a miracle. The data doesn't lie. The numbers don't lie. We see an additional 8 milligrams, as exemplified in Capsule 1 at 6559, coming out at pH 4.5. When I say there should be nothing coming out at pH 4.5, I think if I understand your opponent's argument, it would be, yes, under what are the normal circumstances, but that that particular test, which they submitted, involved soaking for 2 hours and something first and doing this other stuff. It wasn't under the normal test circumstances. These are the normal circumstances. These are the FDA-required protocols, and they were used by the defendant in submitting this antidata. They certified the data was true and correct. They never told the FDA there was anything wrong with the data or that it was flawed. They, you know, are not even today saying that it's unreliable, and it doesn't lie. This hotspot issue was proven at trial to be ethereal, and that's throughout the record. What about the fact that in their description of Figure 1, it explains that this is within the scope of the present invention, so why wouldn't we look at the Figure 1 dissolution profile for the doxycycline as the relevant thing to look at when it expressly says this is within the scope of the present invention? It's within the scope, Your Honor, and for the correct product, it would be the right test, but not for a product that is loosely, enterically coated intentionally with a low 18% coating as opposed to a usual 30% coating, such that some of the pellets are released and growing. This is by design. It's not a miracle. There was no burden on us to review this test. If that's true, why couldn't you replicate it? Like, why couldn't you replicate it if it's true? Like, I mean, because you had these rebuttal batches and things. Why couldn't you replicate it? Why should we have it? Glaxo tells us we can rely on their ANDA submissions. The data was right there. They never told FDA there was anything wrong with that data, and the specification told me that pH 4.5 was a good dividing line. Expressly. Well, actually, it says below 4.5. That doesn't matter. It tells you right after that sentence, Your Honor, it says approximately below 4.5. Here we have a 4.5 test, and it tells you that the orogen is going to start dissolving at the higher pH of 5.5. So 4.5 is a good dividing line. The spec tells us that. And they conducted that test, and they didn't say there was anything wrong with it. The patent says up to two to four hours, so their criticism and the trial judge's criticism of the time points is not well taken. They did this post hoc testing. That's exactly what this court's precedent says you shouldn't rely on because it's not what was submitted to the FDA. It's certified to be the commercial batch and what's going to be sold commercially under Glaxo. All we know is that it's something else. It was 6,000 pellets instead of 230,000. It produced different results, which tells me it was a different product. Now, the district court understood at an early point that the in vitro dissolution data that you heard about was a proxy for blood levels. And it relied, and it was shown that those blood levels at 6520 to 22, those curves, as Judge Lynn noted, line up pretty darn closely. And that's not by accident. The blood levels are mentioned only once in the specification in connection with in vitro dissolution, and they're mentioned as being a proxy for the right ratio of IR to DR. So we can infer from bioequivalence here, as we shouldn't do in most anti-cases, but here bioequivalence is in the claim, where it says to hit these steady state blood levels. And the specification tells us that the in vitro is a proxy for the in vivo numbers that we get later. So they somehow end up with the same blood levels as the 3010 product. The data at 6559 tells me why. Because the release is the same. When you take this drug on steady state, you're getting on average 75% release, and you're getting the same blood levels. That's not a miracle. I thank both counsel. This case is taken under submission. Thank you very much.